UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GERALD SEGLER,

     Plaintiff,

                                         Case No. 22-cv-10389
v.                                     Hon. Matthew F. Leitman

CITY OF DETROIT, *et al.*,

     Defendant.

_____/

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 18)

In this action, Plaintiff Gerald Segler alleges that Defendants the City of Detroit and the City's former Chief of Police, James Craig, violated his federal and state constitutional rights when Craig held up Segler's photo at a press conference and told the public that the person in the photo (*i.e.*, Segler) was a "person of interest" in a string of unsolved shootings.  Segler says that Craig knew that he (Segler) had no connection to the shootings, but Craig held up Segler's photo anyway.  Segler insists that Craig wanted to mislead the public into believing that some progress was being made to identify and stop the shooter.

Segler's allegations, if true, are troubling.  However, the Court agrees with Defendants that they are entitled to judgment as a matter of law on all of Segler's claims.  Thus, for the reasons explained below, Defendants' motion for judgment on the pleadings and/or for summary judgment (ECF No. 18) is **GRANTED**.

1

**I**

**A**

In the summer and fall of 2018, an unknown individual began repeatedly and randomly shooting into the occupied homes of senior citizens in the Dexter Avenue and Joy Road area of the City of Detroit (*See* Craig Press Conference Video, ECF Nos. 33.)  Segler lived and worked in and around that area. (*See* Sworn Statement of Stephanie Carson, Segler's former attorney, at ¶4, ECF No. 26, PageID.315.)  He was also known to open carry an AR-15 style assault weapon and "had been given the moniker 'AR Joe' by police." (*Id.*)

The police had made little progress on their investigation into the shootings. Nonetheless, on November 8, 2018, Craig and members of the Detroit Police Department held a press conference to discuss the shootings. (*See* Craig Press Conference Video, ECF No. 33.)  During that press conference, Craig held up a photo of Segler and told the public that the individual in the photo (*i.e.*, Segler) was a "person of interest" in the investigation. (*Id.*)  Craig said that he did not know the name of the person in the photo and that he needed the public's help in "locating" that person. (*Id.*)

At the press conference, Craig maintained that he did not want to "suggest[] that th[e] person of interest [was] a suspect in the shooting[s]," and he said that the police did not have any reports of the "person of interest" had "ma[de] any threats."

(*Id.*)  But Craig repeatedly said that the "person of interest" was known to open carry a firearm, and he said at least once that the "person of interest" and the suspect could be "one and the same." (*Id.*)  Craig also said that the police had additional reasons – beyond the person of interest's open carrying of a firearm – for wanting to speak with that person about the shootings. (*See id.*)  However, Craig did not identify any of those additional reasons.

Segler says that there was no need for Craig to either hold up his photo or ask for the public's help in locating him because he (Segler) was well known to police who patrolled the area. (*See* Segler Resp. to Req. for Admissions, ECF No. 26, PageID.310.)  Indeed, according to Segler, he had a "friendly" interaction with several officers the night before Craig's press conference. (*Id.*)  Segler claims that after his photo was shown to the public, he lost work as a handyman because people were hesitant to hire him. (*See* Compl. at ¶10, ECF No. 1, PageID.14.)  Segler also says that he began receiving death threats, he "was beaten[,] and the house [he] was living in was vandalized." (Segler Resp. to Req. for Admissions, ECF No. 26, PageID.311.)

Following Craig's press conference, Segler's attorney, Stephanie Carson, arranged a meeting between Segler and Detroit police officers. (*See* Carson Statement at ¶¶ 8 -11, ECF No. 26, PageID.315-316.)  According to Carson, while she "typically [does not] allow [her] clients to make statements [to police] when [she

has] no idea [about] the scope of [an] investigation," she allowed Segler to speak with police because he "was afraid of the continuing violence" against him. (*Id.* at ¶ 9, PageID.315.)  Carson also believed that she "had no choice but to submit [] Segler for questioning by police so that the cloud of suspicion placed on him could be removed." (*Id.*, PageID.316.)

Carson says that during Segler's meeting with police, she "learned that the Detroit Police Department had no evidence or basis to suspect [] Segler of any involvement in the shooting incidents." (*Id.* at ¶ 10, PageID.316.)  She also found out that "Detroit Police officers that patrolled the area knew" that Segler was not involved in the shootings and that those officers had "told Chief Craig" that Segler had no connection to the shootings. (*Id.*)  Finally, Segler says that officers told him that his "photo was used to create the impression something was being done by [Craig] to help his public relations." (Segler Resp. to Req. for Admissions, ECF No. 26, PageID.311.)

On November 13, 2022, the Detroit Police Department told a local television station that Segler was no longer a "person of interest" in the shootings. (*See* FOX2 News Broadcast, ECF No. 18-3.)  The shooter was later identified as the grandson of one of the victims. (*See* Compl. at ¶13, ECF No. 18, PageID.15.)

**B**

Segler filed this action against the City and Craig on November 8, 2021, in the Wayne County Circuit Court. (*See id.*, PageID.5-20.)  Defendants then removed the case to this Court. (*See* Notice of Removal, ECF No. 1, PageID.1-4.)

Segler brings three claims against the Defendants.  In Count 1, Segler alleges that the Defendants violated his federal constitutional right to due process when Craig held up Segler's photo at the press conference and identified Segler (without naming him) as a "person of interest" in the shooting investigation (the "Due Process Claim"). (*See* Compl. at ¶¶ 15-19, ECF No. 1, PageID.15-17.)  In Count 2, Segler claims that (1) the Defendants displayed his photo at the press conference as retaliation against him for exercising his Second Amendment right to open-carry a firearm and (2) Defendants chilled his willingness to lawfully exercise his Second Amendment rights when Craig said at the press conference that police had the right to stop and question individuals open carrying firearms (the "Second Amendment Claim"). (*See id.* at ¶¶ 20-23, PageID.17-18.)  Finally, in Count 3, Segler says that the Defendants' actions violated his right to due process and a fair investigation under the Michigan constitution (the "Michigan Constitutional Claims"). (*See id.* at ¶¶ 24-26, PageID.18-19.)

Despite the fact that Segler is represented by counsel, he conducted no discovery.  For example, he did not seek to take Craig's deposition or the deposition

of any other officer of the Detroit Police Department.  Nor did he request any

documents or videos through any formal discovery requests or submit any

interrogatories to the Defendants.   Segler also failed to timely respond to

Defendants' discovery requests. (*See* Order Granting Defs.' Mot. to Compel, ECF

No. 15.)

### C

On January 30, 2023, Defendants filed a motion for summary judgment

"pursuant to [Federal Rules of Civil Procedure] 12(b)(6) and 56."[1] (Mot., ECF No.

18, PageID.199.)  Defendants argue that (1) the Michigan Constitutional Claims

"must be dismissed because the Michigan Constitution does not grant [Segler] a civil

cause of action for damages," (2) Craig "is entitled to qualified immunity from

liability regarding [Segler's] federal constitutional claims because he did not violate

[Segler's] clearly established constitutional rights," and (3) Segler's claims against

---

[1] To the extent that Defendants seek relief under Rule 12, their motion is more accurately characterized as a motion for judgment on the pleadings pursuant to Rule 12(c) because Defendants previously filed an Answer to Segler's Complaint. *See Wagner v. Higgins*, 754 F.2d 186, 188 (6th Cir. 1985) (holding that a motion's "incorrect reference" to Rule 12(b)(6) rather than to Rule 12(c) "is not fatal where the substance of the motion is plain"); *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 n.1 (6th Cir. 1988) (noting that a motion referring to Rule 12(b)(6) but filed after an answer "may be properly considered as one for judgment on the pleadings under Fed.R.Civ.P. 12(c), and evaluated, nonetheless, under the standards for dismissal under Rule 12(b)(6)"); *Satkowiak v. Bay Cty. Sheriff's Dep't*, 47 F. App'x 376, 377 n.1 (6th Cir. 2002) (treating post-answer Rule 12(b)(6) motion as one for judgment on the pleadings brought under Rule 12(c)).

the City "are barred because governmental employers may not be held vicariously liable for the intentional tortious acts of their employees and [Segler] has failed to otherwise identify any unconstitutional customs, policies[,] or practices of Defendant City of Detroit." (*Id.*, PageID.200-201.)

Segler filed his opposition to Defendants' motion on May 11, 2023. (*See* Segler Resp., ECF No. 26.)  He first argued that Craig was not entitled to qualified immunity.   Segler then asserted that the City could be held liable for Craig's misconduct under *Pembauer v. Cincinnati*, 475 US 469 (1986), because Craig was "the final decision maker" with respect to the Detroit Police Department's polices that led to Segler's photo being used at the press conference. (*Id.*, PageID.299.) Segler offered no substantive response to Defendants' arguments on the Michigan Constitutional Claims.  The Court therefore considers those claims abandoned.[2] *See*, *e.g.*, *See Clark v. City of Dublin*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (recognizing that the failure to respond properly to summary judgment arguments constitutes abandonment of a claim); *Conner v. Hardee's Food Sys.*, 65 F. App'x 19, 24-25 (6th Cir. 2003) (same); *Phillips v. UAW Int'l*, 149 F.Supp.3d 790, 798

---

[2] Segler's response to Defendants' arguments on the Michigan Constitutional Claims was limited to a one-sentence footnote: "Plaintiff concedes that under current law, [his state-law claims] will only become relevant if the Plaintiff's 42 U.S.C. § 1983 claims are dismissed." (Segler Resp. at n.2, ECF No. 26, PageID.290.)  Segler provided no legal basis to support his assertion that the Michigan Constitutional Claims would "become relevant" if the Court dismissed his federal claims, and the Court is not aware of such a basis.

(E.D. Mich. 2016) ("A plaintiff abandons undefended claims") (citing *Doe v. Bredesen*, 507 F.3d 998, 1007-08 (6th Cir. 2007)).

**II**

**A**

As explained above, Defendants argue that they are entitled to judgment as a matter of law under Federal Rules of Civil Procedure 12(c) and 56.

A Rule 12(c) motion is governed by the same standards applicable to a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Lindsay v. Yates*, 498 F.3d 434, 437 n.5 (6th Cir. 2007) ("[T]he legal standards for adjudicating Rule 12(b)(6) and Rule 12(c) motions are the same"). Rule 12(b)(6) provides for dismissal of a complaint when a plaintiff fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007)). A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. Id. (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). When assessing the sufficiency of a plaintiff's claim, a district court must accept all of a complaint's factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). "Mere

8

conclusions," however, "are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664. A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. *Twombly*, 550 U.S. at 556. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Under Rule 56, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 312, 326-27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

**B**

Craig's primary defense against Segler's federal constitutional claims is that he (Craig) is entitled to qualified immunity. The Court may consider that defense in

the context of resolving Defendants' motion under Rule 12(c). *See, e.g., Crawford v. Tilley*, 15 F.4th 752.762-766 (6th Cir. 2021) (explaining that there is no "special rule or presumption against granting motions to dismiss that applies specifically for qualified immunity" and reversing denial of qualified immunity to defendant who moved to dismiss plaintiff's complaint under Rule 12 on the basis of qualified immunity).

"Qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016) (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "This immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

"There are two steps to [a] qualified-immunity inquiry" at the motion to dismiss stage. *Crawford*, 15 F.4th at 762. The Court must "determine whether the facts alleged make out a violation of a constitutional right." *Id.* (internal quotation marks and citation omitted). "And [the Court] also [must] ask whether the right at issue was clearly established when the event occurred so that a reasonable officer

10

would have known that his conduct violated it." *Id.* (internal quotation marks and citation omitted).  The Court "may answer these questions in any order." *Id.*

In the qualified immunity context, "[t]he sources of clearly established law to be considered are limited. [Courts in this Circuit] look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth] [C]ircuit, and finally to decisions of other circuits." *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013).  As the Sixth Circuit has explained, a "defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite [such] that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." *Wenk v. O'Reilly*, 783 F.3d 585, 598 (6th Cir. 2015) (quoting *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014)).

## III

The Court begins with the Due Process and Second Amendment Claims against Craig.  The Court agrees with Defendants that Craig is entitled to qualified immunity with respect to both claims.[3]

---

[3] In a supplemental brief, Segler argues that the Court should not consider Craig's qualified immunity argument because "Defendants [did] not raise[] Qualified Immunity as an Affirmative Defense in their pleadings." (Segler Supp. Br., ECF No. 34, PageID.372.)  Segler is wrong.  Craig specifically raised qualified immunity as an affirmative defense in his Answer to Segler's Complaint. (*See* Answer, ECF No.

**A**

In the Due Process Claim, Segler alleges that Craig's conduct at the press conference violated his "established due process right to a hearing and opportunity to defend himself against the public imputation of criminality, immorality, stigma[,] and obloquy." (Compl. at ¶16, ECF No. 1, PageID.15.)  Segler adds that Craig's actions injured Segler's reputation in the community, "foreseeably resulted in physical harm injury and loss of property and income," and caused a "restriction of [Segler's] movement and association." (*Id.*, PageID.15-16.)

The Court agrees with Segler that, if his allegations are true, what happened here is very troubling.  An innocent man was held out to the public as someone who could have some possible connection to an unsolved string of disturbing shootings. Moreover, the public was actively misled into believing that some progress was being made into a critical investigation when, in fact, the opposite was true.

Despite the unsettling nature of Segler's allegations, Craig is entitled to qualified immunity with respect to the Due Process Claim.  As explained above, to defeat qualified immunity, (1) Segler's allegations must "make out a violation of a

---

5, PageID.70: "[T]he individual defendant is qualifiedly immune from the imposition of liability.")  To the extent Segler further argues that Craig did not sufficiently raise or support his qualified immunity defense in his motion for summary judgment, the Court again disagrees.  Craig's motion contains a lengthy and detailed discussion supporting his qualified immunity defense that includes citations to relevant legal authorities. (*See* Mot., ECF No. 18, PageID.218-223.)

constitutional right" and (2) that right must have been "clearly established when the event occurred." *Crawford*, 15 F.4th at 762.  Segler's allegations in the Due Process Claim fail to satisfy either prong of that standard.

First, Segler's allegations in the Due Process Claim do not "make out a violation of a constitutional right." *Id.*   To plead a viable claim that Craig's alleged defamation of Segler deprived Segler of due process, Segler must satisfy what is known as the "stigma-plus" test first described in *Paul v. Davis*, 424 U.S. 693 (1976). *See*, *e.g.*, *Doe v. Mich. Dept. of St. Police*, 490 F.3d 491, 502 (6th Cir. 2007) ("The stigma-plus test is used to determine whether state action violates an individual's procedural due process rights"); *Hart v. Hillsdale County, Mich.*, 973 F.3d 627, 644 (6th Cir. 2020) (explaining that *Paul* "sets out the so-called 'stigma-plus' test"). Under the stigma-plus test, a plaintiff must show more than defamation to state a viable due process claim.  As the Supreme Court explained in *Paul*, "the frequently drastic effect of the 'stigma' which may result from defamation by the government […] does not establish the proposition that reputation alone […] is either 'liberty' or 'property' by itself sufficient to invoke the procedural due process protection of the Due Process Clause." *Paul*, 424 U.S. at 701.  Instead, "[a] successful plaintiff must [] show that the state's action both damaged his or her reputation (the stigma) and that it 'deprived [him or her] of a right previously held under state law' (the plus)." *Doe*, 490 F.3d at 501-02 (quoting *Paul*, 424 U.S. at 708).

Segler's allegations in the Due Process Claim fail to sufficiently allege the required "plus."  Segler has not identified any right "previously held under state law" that he has been deprived of *by Craig*.  Instead, he alleges that, as a result of Craig's statements at the press conference, third parties chose not to hire him as a handyman or chose to physically attack him.  But the fact that third parties unfortunately chose to treat Segler in those ways does not mean that *Craig* deprived Segler of a state-created right.

Second, Segler has not identified a clearly established right that Craig allegedly violated.  More specifically, Segler has not identified any case that would have clearly established to Craig that holding up Segler's photo at a press conference and identifying the person in the photo as a "person of interest" – even if Craig knew that the person was not involved in the shootings – would violate Segler's due process rights.  The only cases on which Segler relies are *Paul*, *supra*, and the Supreme Court's decision in *Wisconsin v. Constantineau*, 400 U.S. 433 (1971).  But neither *Paul* nor *Constantineau* clearly establish that Craig violated Segler's constitutional rights under the facts pleaded here.  In *Paul*, the police accused the plaintiff of being an active shoplifter, and the Supreme Court held that that accusation was *not* enough to violate the plaintiff's due process rights. *See Paul*, 424 U.S. at 698-99.  And in *Constantineau*, the police "caused" a notice "to be posted […]  in all retail liquor outlets in Hartford that sales or gifts of liquors to [the

14

plaintiff] were forbidden for one year." *Constantineau*, 400 U.S. at 435. The notice

was placed pursuant to a Wisconsin statute that allowed police to, in writing, "forbid

the sale or gift of intoxicating liquors to one who 'by excessive drinking' produces

described conditions or exhibits specified traits, such as exposing himself or family

'to want' or becoming 'dangerous to the peace' of the community." *Id.* (quoting Wis.

Stat. § 176.26 (1967)). Thus, the police action in *Constantineau* directly deprived

the plaintiff of his ability to purchase alcohol. Craig's alleged conduct here had no

such direct and immediate consequence. Simply put, while Craig's actions at the

press conference were troubling for all of the reasons explained above, Segler has

not identified any case that would have clearly established that holding up someone's

photo at a press conference and identifying that person as a "person of interest"

would amount to a due process violation.

 For all of these reasons, Craig is entitled to qualified immunity with respect

to the Due Process Claim.[4]

---

[4] In Segler's supplemental brief, he provided the Court a revised sworn statement from his former attorney, Stephanie Carson. (*See* Revised Carson Statement, ECF No. 36.) In her revised statement, Carson more clearly states that she was told by a Detective with the Detroit Police Department that (1) "many Detroit police officers knew" that Segler was not involved in the shootings, (2) those officers "conveyed" that information to Craig, but (3) Craig nonetheless "wanted to go ahead and have his news conference anyway." (*Id.* at ¶11, PageID.393.) Carson's revised statement does not change the Court's analysis for two reasons. First, her revised statement comes too late, and the Court therefore will not consider it. Second, and more importantly, even if the Court accepted Carson's statement that Craig knew that Segler was not involved in the shootings but choose to hold up Segler's photograph

**B**

Segler has also failed to overcome Craig's invocation of qualified immunity

on the Second Amendment Claim.  Though it is somewhat unclear, it appears that

Segler's Second Amendment Claim has two components.  The first component

appears to be akin to a First Amendment retaliation claim.  Segler says that he

engaged in a protected activity – the legal, open carrying of a firearm – and that

Craig retaliated against him for exercising that right by taking an adverse action

against him (*i.e.*, holding up Segler's photo at the press conference and identifying

the person in the photo as a "person of interest" in the unsolved shootings).  The

second component of this claim seems to rest upon a "chilling" theory.  Segler says

that at the press conference, Craig wrongfully proclaimed that the police could stop

and question individuals who were open carrying firearms, and Segler says those

comments chilled his willingness to lawfully exercise his Second Amendment rights.

The problem for Segler is that the theories underpinning the Second

Amendment Claim are too novel to defeat Craig's qualified immunity defense.

Segler has not identified any case that recognizes a Second Amendment retaliation

claim.  And even if there were such a viable claim, Segler has not cited a case that

---

at the press conference anyway, Craig would still be entitled to qualified immunity.
Simply put, Segler has not cited any case that would have clearly established to Craig
that even if he engaged in a knowing defamation of Segler, that act, standing alone,
would violate Segler's due process rights.  For all of these reasons, Carson's revised
statement does not change the Court's analysis or conclusion here.

even remotely suggests that holding up someone's photo and identifying that individual as a person of interest meaningfully interferes with a person's Second Amendment rights. Finally, Segler has not identified any case that recognizes that a person's Second Amendment rights could be "chilled" based on public statements like those Craig made here.

For all of these reasons, Craig is entitled to qualified immunity with respect to the Second Amendment Claim.

**IV**

Finally, the Court turns to Segler's municipal liability claims against the City of Detroit.[5] In those claims, Segler maintains that under the Supreme Court's decision in *Pembaur*, *supra*, he may hold the City liable for Craig's actions during the press conference. In *Pembaur*, the Supreme Court held that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur*, 475 U.S. at 480. Segler says that *Pembaur* controls here because Craig was "acting as the final decisionmaker" and policymaker when Craig

---

[5] Generally, a municipality cannot be held liable where there is no underlying constitutional violation by a municipal employee. *See, e.g., Robertson v. Lucas,* 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no liability [for a municipality] […] without an underlying constitutional violation"); *Przybysz v. City of Toledo,* 746 F. App'x 480, 484 (6th Cir. 2018) ("As a threshold matter, there can be no municipal liability […] when there is no constitutional violation"). Here, however, the Court needs to address the City's potential liability because it resolved a portion of the constitutional claims against Craig on the "clearly established" prong of the qualified immunity test.

"set[]" and "execut[ed] the policy to scapegoat [Segler] for the failures of the investigation into the shootings." (Segler Resp., ECF No. 26, PageID.299-300.)

Segler's reliance on *Pembaur* is misplaced.  "Although *Pembaur* recognized policy-maker liability, the Court made clear that 'not every decision by municipal officers automatically subjects the municipality to § 1983 liability.'" *Moldowan v. City of Warren*, 578 F.3d 351, 394 (6th Cir. 2009) (quoting *Pembaur*, 475 U.S. at 482).  "Rather, municipal liability 'attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.' In other words, the official must be 'responsible for establishing final government policy respecting such activity before the municipality can be held liable.'" *Id.* (quoting *Pembaur*, 475 U.S. at 482).

Here, Defendants have presented evidence that Craig did not have final, policy-making authority for the Detroit Police Department.  More specifically, Defendants directed the Court to several articles of the Detroit City Charter that provide that the Board of Police Commissioners (the "Board") is empowered with that final policy making authority.[6]  Defendants begin with the section of the Charter

---

[6] Although Segler did not attach the City Charter to his Complaint, the Court may take judicial notice of that official record and consider it in the context of resolving Defendants' motion. *See*, *e.g.*, *Hughes v. City of Wayne*, *Michigan*, 2023 WL 3093900, at *4 n. 3 (6th Cir. Apr. 26, 2023) (citing *Jackson v. City & County of Denver*, 2022 WL 120986, at *1 n.1 (10th Cir. Jan. 13, 2022) (taking judicial notice of the Denver City Charter)); *Demos v. City of Indianapolis*, 302 F.3d 698, 706 (7th Cir. 2002) (recognizing federal courts' power to take judicial notice of city charters

that outlines the duties of the Board.  That section provides that the Board, *not* the

Chief of Police, "establish[es] policies, rules and regulations" for the Detroit Police

Department. Detroit City Charter § 7-803.  The Chief of Police merely "consult[s]"

in that process. *Id*.  Defendants then turn to the section of the Charter that describes

the duties of the Chief of Police.  That section provides that the Chief "administer[s]

the department consistent with the policies, rules, and regulations *established by the*

*Board*." Detroit City Charter § 7-806(1) (emphasis added).  And the Chief may only

"[r]ecommend rules, regulations, and procedures *to the Board for its approval*."

Detroit City Charter § 7-806(2) (emphasis added).  These Charter provisions are

competent evidence that Craig was not the relevant policy or decision maker. *See*,

*e.g.*, *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (explaining

that "[t]o determine whether final authority to make municipal policy is vested in a

particular official, we must resort to state law [….] [i]nclud[ing] statutes, ordinances,

and regulations, and less formal sources of law such as local practice and custom,"

and looking to city charter to determine if Chief of Police had final authority over

drug testing policy).  In response, Segler has not identified any evidence – aside from

Craig's title – that he was the relevant decision maker or policy maker.  Indeed, he

---

and other public records)); *Wilson v. City of Ferndale*, 2019 WL 4080629, at \*3
(E.D. Mich. Aug. 29, 2019) ("The court may consider the Charter in deciding this
motion because it is a public record."); *Holt v. City of Dickson*, 2015 WL 6619969,
at \* 2 n. 2 (M.D. Tenn. Oct. 30, 2015) (taking judicial notice of city charter).

has not presented any evidence that Craig was the individual who had decision

making authority with respect to when to identify individuals as a persons of interest

in unsolved crimes.  Nor has he identified any practice or custom that would have

provided Craig that authority.  In the absence of that evidence, and in light of the

City Charter provisions identified by Defendants, the Court cannot hold the City

liable under *Pembaur* for Craig's alleged misconduct.

IV

For all of the reasons explained above, Defendants' motion for judgment on

the pleadings and/or summary judgment (ECF No. 18) is **GRANTED**.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 13, 2023

I hereby certify that a copy of the foregoing document was served upon the
parties and/or counsel of record on September 13, 2023, by electronic means and/or
ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126